# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 13 2019, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

A.W. and Al.W (Minor Children)

And

T.N.D. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

November 13, 2019

Court of Appeals Case No. 19A-JT-852

Appeal from the Elkhart Circuit Court

The Honorable Michael A. Christofeno, Judge

The Honorable Deborah Domine, Magistrate

Trial Court Cause No. 20C01-1812-JT-72 & 20C01-1812-JT-73

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, T.N.D. (Mother), appeals the trial court's termination of her parental rights to her minor children, A.W. and Al.W. (Children).

We affirm.

# ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the Department of Child Services (DCS) presented clear and convincing evidence to support the trial court's termination of Mother's parental rights.

# FACTS AND PROCEDURAL HISTORY

Mother and B.W. (Father) are the parents of A.W., born on November 9, 2012, and Al.W., born on December 14, 2015.[1] On October 3, 2017, DCS filed its Children in Need of Services (CHINS) petition, alleging parental substance abuse, domestic violence, and neglect. It was purported that Father was found passed out next to a Redbox, while in possession of marijuana, and A.W. was found wandering nearby without supervision. At the time, the Children were not removed from their parents' care. On October 24, 2017, the trial court adjudicated the Children to be CHINS upon the parents' admission to the

---

[1] Although the Father was subject to the CHINS proceedings, the trial court did not terminate his parental rights to the Children and therefore, he is not part of this appeal. Facts pertaining to Father will be included as necessary.

allegations in DCS's petition, with Mother specifically conceding that "she was arrested on allegations of domestic violence," and that she and Father tested positive for marijuana. (Exh. p. 50). On December 6, 2017, the trial court entered its dispositional decree, ordering the Children's placement in the parents' home under DCS's supervision. In addition, the trial court ordered the parents to enroll in classes and to engage in random drug screens.

[5] On March 7, 2018, DCS filed its progress report, noting that at the February 22, 2018 child and family team meeting, Mother "reported she is unable to care for her [C]hildren and would like to sign over her rights to [Father's] parents as the family would be homeless in two weeks." (Exh. p. 79). Mother stated that the home was infested with bed bugs, lead was present in the residence, and that the maternal aunt was using methamphetamine in front of the Children. DCS reported that Mother had not completed court-ordered services, including a domestic violence assessment and a substance abuse assessment. On March 15, 2018, the trial court conducted a hearing on DCS's progress report—Mother failed to appear. DCS informed the court that Mother did "not intend to do any services right now" and had requested the Children be removed from her care and placed in relative placement. (Transcript p. 37). DCS further advised the trial court that Mother had mental health issues and was "struggling to take care of the kids." (Tr. p. 38). She was not participating in services and was not cooperating with drug screens, testing positive for amphetamines twice. At the close of the evidence, the trial court modified its dispositional decree by

removing the Children from their parents' care and placing them with paternal grandparents.

[6] On August 4, 2018, DCS submitted another progress report. DCS reported that between May 10 and July 2, 2018, the service provider "suspended random drug screen collection" due to Mother's non-compliance. (Exh. p. 93). Although DCS made a new referral for her drug screens, Mother failed to participate on July 20, 27, and 30, 2018. She also failed to appear at the August child and family team meeting, she was inconsistent in attending visitation with the Children and had canceled visits. The service provider suspended Mother's visits with the Children because of her non-compliance. On August 16, 2018, the trial court conducted a permanency hearing on DCS's progress report—again, Mother did not appear. DCS reported that Mother had "missed nine scheduled supervised visitations," and when she did attend visits she was "not prepared," and failed to bring diapers, food, or snacks for the Children. (Tr. p. 50). During the visits that Mother did attend, she would often refuse to change Al.W.'s diaper, resulting in a rash due to wearing a urine and feces-soaked diaper. (Tr. p. 57). After visits, the Children would "act out when a visit was bad," and the Children were "really hurt" by the way Mother acted towards them. (Tr. p. 57). To date, Mother had not participated in any court-ordered services, and had failed to show for several drug screens. DCS clarified that Mother "did take a couple [drug screens] in the beginning, but she tested positive for methamphetamines and amphetamines, and then she quite [sic] showing up to take random drug screens." (Tr. p. 53). At the close of the

hearing, the trial court affirmed DCS's findings and found that Mother had not participated in court-ordered services, missed several drug screens, and failed to consistently participate in visitation.

[7] On November 21, 2018, DCS filed a rule to show cause, alleging that Mother had not maintained consistent contact with DCS and had not participated in supervised visitation with the Children. On December 3, 2018, the trial court held a hearing on DCS's filing—Mother was not present. At the beginning of the hearing, DCS informed the trial court that it had just learned that morning that Mother was incarcerated and that she had a pending warrant for domestic battery. DCS requested its cause to be reset and the permanency plan deferred. The trial court ordered the permanency plan changed to a concurrent plan of reunification and adoption. On December 31, 2018, DCS filed its petition to terminate the parents' rights to their Children.

[8] DCS's January progress report advised that Mother had not completed any court-ordered services, and had missed drug screens from August through December 2018. On January 17, 2019, the trial court conducted a hearing on DCS's rule to show cause, as well as an initial hearing on DCS's petition for termination. Although Mother was still incarcerated, she was present for the hearing. DCS reported that Mother had not participated in any domestic violence assessments, substance abuse assessments, random drug screens, or visitation. DCS offered Mother mental health services, but she "hasn't participated in that either[.]" (Tr. p. 102). The trial court denied DCS's rule to

show cause because Mother had been homeless, was struggling with mental illness and addiction, and was currently incarcerated.

[9] On March 15, 2019, the trial court conducted a termination fact-finding hearing. During the hearing, Beverly Hooley (Hooley), Mother's probation officer, testified that Mother was convicted of domestic battery as a misdemeanor on February 19, 2018 and was sentenced to a year of probation, ordered to complete an anger management assessment and parenting classes. Hooley notified the court that upon completion of her assessment, Mother was referred to addiction treatment, which she failed to attend. Due to her non-participation, the probation department filed a violation in August 2018. Because she tested positive for methamphetamine in August 2018, Mother had to serve some time in jail. Hooley advised that Mother was eventually taken into custody around December 4, 2018 on a bench warrant and was released on February 13, 2019. Prior to the termination hearing, Mother completed a domestic violence assessment as part of her probationary requirements, but requested the assessor not to share the results of the assessment with the DCS. Overall, Hooley opined that Mother was "just not making a lot of progress." (Tr. p. 115).

[10] Mother testified that she did not keep contact with DCS, and had a problem meeting her probationary requirements. She admitted that she went through "a period of mental breakdown . . . started using drugs, gave up on life." (Tr. p. 188). Since being released from incarceration on February 12, 2019, she had attended an "all in one" anger management and substance abuse assessment.

(Tr. p. 190). She was recommended to participate in different services, but due to transportation problems, had not yet attended any classes. Mother described herself as having "high anxiety, bipolar disorder, ADHD, among a bunch of others," as well as being afflicted with mental health issues and had attempted suicide. (Tr. p. 198). She admitted that she was not on any medication.

[11] Tasha Beal, the DCS family case manager (FCM Beal), informed the trial court that after the Children were removed from the parents' care on March 19, 2018, she did not hear from Mother until May 26, 2018. Mother failed to stay in contact with DCS and "just kind of disappeared until our court date that we had in December of last year." (Tr. p. 123). FCM Beal testified that Mother tested positive four times for methamphetamines and amphetamines. She had eighteen failures to show for a drug screen and one refusal. Mother's last visit with the Children was in April or May of 2018 and, due to her non-compliance, Mother's visitation was suspended in August 2018. As to her court-ordered services, FCM Beal reported that Mother "just made several appointments and when it was time to get them completed, she would cancel or no-show." (Tr. p. 126).

[12] FCM Beal recommended termination of Mother's parental rights as the Children were now in a stable environment in which they have permanency and "it would be really harmful to remove them out of that environment." (Tr. p. 132). Amy Fought, the Children's CASA (CASA Fought), testified that the Children were "thriving under the stability" they received in their paternal grandparents' home. (Tr. p. 165). As the Children feel very secure and safe in

their paternal grandparents' home, CASA Fought opined that it would be devastating to the Children's wellbeing if they were removed from the paternal grandparents' care and recommended adoption by them.

[13] On March 29, 2019, the trial court entered its decree, terminating Mother's parental rights to the Children, concluding that there is a reasonable probability that the conditions that resulted in the Children's removal or reasons for placement outside the home will not be remedied and that termination is in the best interest of the Children.

[14] Mother now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[15] Mother challenges the termination of her parental rights to the Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). However, parental rights "are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* If "parents are unable or unwilling to meet their parental responsibilities," termination of parental rights is appropriate. *Id.* We recognize that the termination of a parent-child

relationship is "an 'extreme measure' and should only be utilized as a 'last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed.'" *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015).

[16] Indiana courts rely on a "deferential standard of review in cases concerning the termination of parental rights" due to the trial court's "unique position to assess the evidence." *In re A.K.*, 924 N.E.2d 212, 219 (Ind. Ct. App. 2010), *trans. dismissed*. Our court neither reweighs evidence nor assesses the credibility of witnesses. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We consider only the evidence and any reasonable inferences that support the trial court's judgment, and we accord deference to the trial court's "opportunity to judge the credibility of the witnesses firsthand." *Id.*

## II. *Termination of Parental Rights Statute*

[17] In order to terminate a parent's rights to her child, DCS must prove:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> * * * *
> (iii) The child has been removed from the parent and has been under the supervision of a local office . . . for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a [CHINS] . . . ;
>
> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS];

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove each of the foregoing elements by clear and convincing evidence. *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014). "[C]lear and convincing evidence requires the existence of a fact to 'be highly probable.'" *Id.*

## A. *Requisite Period of Time*

[18] On appeal, Mother contends that DCS did not meet the statutory requisite period of time the Children must be removed from her care. Focusing on the first prong of the statute, Mother claims that the Children were "not removed under a dispositional order, and therefore the six-month period should not have been alleged by the DCS or applied by the court." (Appellant's Br. p. 15).

[19] In the *Matter of Robinson*, 538 N.E.2d 1385, 1387 (Ind. 1989), our supreme court observed that dispositional decrees are "one of many steps in the continuing

procedural scheme for the care and protection of the children with the ultimate result of either returning them to their home or terminating the parental rights." Dispositional hearings, and the orders that result therefrom, are used to set "a program to be pursued that will ultimately result in a final disposition of the cause." The statutory timing requirements provided by I.C. § 31-35-2-4(b)(2)(A) insure that the parents have an adequate opportunity to make the corrections necessary in order to keep the family unit intact. *In re N.Q.*, 996 N.E.2d 385, 394 (Ind. Ct. App. 2013). "For purposes of the element of the involuntary termination statute requiring a child to have been removed from the parent for at least six months under a dispositional decree before termination may occur . . . such a dispositional decree is one that authorizes an out-of-home placement." *Id*. at 394 n.7.

[20] Although the Children had been removed from care and supervision of the parents on March 19, 2018, it was not until April 9, 2018 that the trial court modified its dispositional decree and concluded that the Children should be removed from their home and "placed in relative care[.]" (Exh. p. 87). *See* I.C. § 31-34-23-1 (a trial court may modify any dispositional decree upon its own motion, the motion of a party, or the motion of a service provider). The Children were removed per the trial court's dispositional decree of April 9, 2018 and more than eight months later, on December 31, 2018, DCS filed its petition

to terminate the parents' rights. Accordingly, the trial court complied with the timing requirements of the statute.[2]

### B. *Conditions Have not Been Remedied*[3]

[21] Mother claims that there is insufficient evidence to support the trial court's determination that the conditions which resulted in the removal of the Children have not been remedied. It is well established that "[a] trial court must judge a parent's fitness as of the time of the termination hearing and take into consideration evidence of changed conditions." *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 828 (Ind. Ct. App. 1995), *trans. denied*. In judging fitness, a trial court may properly consider, among other things, a parent's substance abuse and lack of adequate housing and employment. *McBride v. Monroe Co. OFC*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). The trial court may also consider a parent's failure to respond to services. *Lang v. Starke Co. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. "[H]abitual patterns of conduct must be evaluated to determine whether there is a substantial probability of future neglect or deprivation." *Stone*, 656 N.E.2d at 828. A trial court "need not wait until the children are irreversibly influenced

---

[2] Indiana Code section 31-35-2-4(b)(2)(A) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements. Here, DCS satisfied the first prong of the section; therefore, we need not address Mother's argument that the DCS failed to satisfy the requirement that the Children must be removed and placed under DCS's supervision for at least fifteen of the most recent twenty-two months.

[3] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; therefore, DCS is required to prove only one of three listed elements. *See In re A.K.*, 924 N.E.2d at 220-21. In this case, the trial court based its termination decision on DCS's satisfaction of Indiana Code section 31-35-2-4(b)(2)(B)(i)—that the conditions that resulted in the Child's removal have not been remedied and the continuation of the parent-child relationship posed a threat to the Child's well-being.

by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship." *Id*. Furthermore, "[c]lear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1230.

[22] In support of her argument that the conditions which resulted in the removal of the Children have been remedied, Mother refers to her own testimony that she was working on completing probation requirements, which "indicates that some progress was made towards completing services." (Appellant's Br. pp. 16-17).

[23] While the case originated as an in-home CHINS with the Children remaining in Mother's care, on February 22, 2018, Mother admitted to wanting to sign her rights over to paternal grandparents as she would be homeless within two weeks. After the Children were placed in the paternal grandparents' care, Mother ceased all efforts to be reunited with the Children. FCM Beal testified that Mother failed to participate in any services: she did not complete her domestic violence assessment, substance abuse assessment, or parenting classes. She failed to show up for most of the random drug screens: Mother had four positive drug screens for methamphetamine, refused to take one drug screen, and was a no-show for eighteen drug screens. Mother has not consistently visited with the Children—to the point her visitation was suspended and has

never resumed. Although Mother was incarcerated during part of these proceedings, she stopped visiting the Children well before her incarceration.

[24] Mother testified that she is focused on completing her probation requirements and not on what is necessary for the reunification with her Children. To that end, she completed a domestic violence assessment within the framework of her probationary requirements, but asked the assessor not to share these results with the DCS.

[25] A trial court is "within its discretion to disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of conduct prior to those efforts." *K.T.K.*, 989 N.E.2d at 1234. "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). Mindful of this guideline, the trial court observed in its Order, that Mother "testified that she wants her [Children] back, but she has also stated that she is currently not ready or fit to care for them, [Mother] has a long history of drug use, mental illness, and domestic violence and none of it has been treated." (Appellant's App. Vol. II, p. 23). Here, the evidence presented clearly and convincingly shows a reasonable probability exists that the conditions that led to the Children's removal from Mother's care will not be remedied. Although Mother exhibited a recent turnaround in behavior and limited compliance with her probationary requirements, she has yet to start complying with DCS's services. The trial court was entitled to weigh the evidence as it found appropriate in the context

of this case, and found that Mother's prior conduct was more telling than her efforts she exerted prior to the termination hearing. Accordingly, we find that the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children' s removal from Mother's care will not be remedied was not clearly erroneous.

### C. *Best Interests of the Children*

[26] Mother also challenges the trial court's conclusion that termination is in the Children's best interest. The premise of her argument focuses on the trial court's decision not to terminate Father's parental rights and as such, Mother advises us that the Children "can benefit from interaction with parents when they show up." (Appellant's Br. p. 17).

[27] To determine whether termination is in a child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. The court must subordinate the interests of the parents to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* We have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interest. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

[28] Here, FCM Beal and CASA Fought advocated to terminate Mother's parental rights to the Children. Mother failed to avail herself of the opportunities and services offered by DCS to reunite with the Children and made no progress nor commitment during the proceedings of the case. "[C]hildren cannot wait indefinitely for their parents to work toward preservation or reunification." *In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014). Even though "the ultimate purpose of the law is to protect the child, the parent-child relationship will give way when it is no longer in the child's interest to maintain this relationship." *In re B.D.J.*, 728 N.E.2d 195, 200 (Ind. Ct. App. 2000).

[29] The record further reflects that the Children are thriving in the care of their paternal grandparents. The Children are bonded and enjoy permanency; "[t]ermination, allowing for a subsequent adoption, would provide them with the opportunity to be adopted into a safe, stable, consistent, and permanent environment where all their needs will continue to be met, and where they can grow." *In re A.D.S.*, 987 N.E.2d at 1159.

[30] Mother also contends that because Father's parental rights to the Children were not terminated, it cannot be in the Children's best interest to terminate the relationship with their Mother. In terminating the rights of Mother and not those of Father, the trial court concluded that "[b]oth parents testified that they are no longer in a relationship. And the fact that termination is not supported by the evidence in [F]ather's case, does nothing to negate the conclusion that the DCS has carried its burden of proof as it relates to the [M]other." (Appellant's App. Vol. II, p. 24). *See, e.g., Z.B. v. Ind. Dep't of Child Serv's*, 108

N.E.3d 895, 903 (Ind. Ct. App. 2018) (Only Mother's parental rights were terminated as "Mother remained unable to safely care for the child, even after participating in extensive services aimed towards reunification."), *trans. denied*.

Mother's historical inability to provide a suitable environment for the Children, together with her current inability to do the same, supports the trial court's conclusion that termination of her parental rights is in the best interests of the Children. Accordingly, we affirm the trial court's decision.

# CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the trial court's Order terminating Mother's parental rights to the Children.

Affirmed.

Vaidik, C. J. and Bradford, J. concur